UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JOHN DOE,

Plaintiff,

-against-

RENSSELAER POLYTECHNIC INSTITUTE ("RPI"),
ELIZABETH BROWN-GOYETTE, Title IX Investigator;
LARRY HARDY, Title IX Coordinator; TRAVIS APGAR,
Assistant Vice President and Dean of Students; LENORMAN
STRONG, Special Assistant to the President; and PETER
KONWERSKI, Vice President for Student Life at RPI,

Defendants.

**COMPLAINT
JURY TRIAL
DEMANDED**

Case No.:

1:19-cv-719 (BKS/DJS)

---

## INTRODUCTION

1.     Defendant Rensselaer Polytechnic Institute ("RPI") is an internationally recognized engineering college located in Troy, New York.

2.     In the years prior to the events described below, RPI came under tremendous scrutiny and pressure by the media, the public and its campus community for its handling of female-student's complaints of sexual violence allegedly committed by male RPI students on RPI's campus.

3.     In sum, RPI was accused of being lenient on male students and, at best, indifferent to female student's claims that they were victims of sexual misconduct.

4.     As described below, in response to this scrutiny and pressure, RPI introduced significant policy changes in the way it educated and trained students, faculty,

staff, investigators and adjudicators about sexual misconduct and the way that it investigated and adjudicated allegations of sexual violence.

5.     These changes, however, discriminate against male students because of their sex and deprive male students important due process rights they are guaranteed under federal law.

6.     As a result of these discriminatory changes, over the course of three years (2015-2018), reports of sexual misconduct involving RPI's community increased by over 400%. In 2017-2018, 81% of the allegations were made against male students and only 6% were made against female students.[1]

7.     Plaintiff John Doe, a male sophomore student enrolled at RPI, brings this sexual discrimination action under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 to seek relief and recover damages for the sexual discrimination he has endured as a male student at RPI. Plaintiff also seeks damages under New York common law for the multiple breaches of the express and implied contract between RPI and Plaintiff.

8.     RPI's sexual discrimination against Plaintiff manifested itself in **three separate proceedings** involving Plaintiff.

9.     **First**, on May 23, 2019, Plaintiff was suspended from RPI after Defendant Peter Konwerski, Vice President for Student Life at RPI, denied Plaintiff's appeal of an RPI Hearing Board's determination that Plaintiff violated RPI's sexual misconduct policy for events alleged to have occurred on September 20, 2018.

---

[1] 2017-2018 RPI Title IX Report available at: https://info.rpi.edu/greek-life-task-force/2017-2018-title-ix-summary; last visited June 13, 2019.

{O0423546.1}

10.     As described below, this erroneous and sexually biased determination was the result of RPI's discriminatory, flawed and unlawful investigation and adjudication process that sexually discriminated against Plaintiff because he is a male student.

11.     **Second**, while investigating the allegation referenced above, RPI intentionally initiated a second disciplinary proceeding against Plaintiff for a separate allegation of sexual misconduct that was baseless, brought in bad faith and against the wishes of the other student involved.

12.     After mounting an overwhelming defense to this second allegation, RPI ultimately closed the proceeding without taking any disciplinary action against Plaintiff. Nonetheless, the second allegation was brought against Plaintiff because of RPI's institutional discrimination against male students generally and Plaintiff as a male student.

13.     **Third**, while both the first and second allegations were being investigated and adjudicated, Plaintiff suffered from improper, wrongful and prejudicial retaliation in violation of RPI's policies and procedures.  Plaintiff promptly reported this retaliation to RPI and RPI took no immediate action.

14.     While RPI eventually initiated an investigation into Plaintiff's retaliation claim on November 30, 2018, no further action has been taken and no resolution has been announced despite RPI's stated policy to promptly investigate and adjudicate allegations of misconduct with a goal of resolving claims within 60 days.

15.     As described in more detail below, part of the discrimination Plaintiff has endured is RPI's selective enforcement of its Policies and Procedures and Sexual Misconduct Bill of Rights on the basis of his status as a male student.

16.   As a consequence, Plaintiff brings this action to:

a)   reverse and annual RPI's biased, erroneous and selective determination finding him responsible for sexual harassment and the resulting sanction of suspension;

b)   to enjoin RPI from imposing the unjustified and improper sanction during the pendency of this litigation; and

c)   to recover damages, expenses, fees and disbursements as determined by a jury.

## **PARTIES**

17.   Plaintiff, is a sophomore, male student at RPI.

18.   Plaintiff resides in De Pere, Wisconsin.

19.   Disclosure of Plaintiff's identity will cause him irreparable harm as this matter involves issues of extreme personal intimacy and refers to educational records and proceedings that are protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232.

20.   RPI is a University located in the City of Troy, County of Rensselaer, State of New York.

21.   RPI offers undergraduate and graduate degrees in a variety of programs and is a world-renowned engineering college.

22.   RPI accepts federal financial assistance and is bound to follow Title IX and federal law.

23.     Elizabeth Brown-Goyette is a Title IX investigator employed by RPI. She investigated and prepared an investigatory report for the first allegation and initiated the second investigation against Plaintiff. She is sued individually and as RPI's employee/agent.

24.     Larry Hardy is RPI's Title IX Coordinator and Director of Employee Relations and Professional Development. Mr. Hardy coordinated all three investigations and served as the investigator for Plaintiff's retaliation claim. Mr. Hardy also serves on RPI's Case Management Team which makes both initial determinations regarding whether a violation of RPI's Policies and Procedures is alleged and, after an investigation, to determine whether an allegation is supported by a preponderance of the evidence and should proceed to a disciplinary hearing. He is sued individually and as RPI's employee/agent.

25.     Upon information and belief, Mr. Hardy helped develop the sexually discriminatory Title IX process and sexual assault education and training for students, faculty, staff, investigators and adjudicators that fostered and created a discriminatory environment at RPI.

26.     Travis Apgar is RPI's Assistant Vice President and Dean of Students. He coordinated and participated in the process of both allegations against the Plaintiff and is a member of RPI's Case Management Team. He is sued individually and as RPI's employee/agent.

27.     Upon information and belief, Mr. Apgar helped develop the sexually discriminatory Title IX process and sexual assault education and training for students,

faculty, staff, investigators and adjudicators that fostered and created a discriminatory environment at RPI.

28.     LeNorman Strong is RPI's Special Assistant to the President. Mr. Strong served as the chair of the hearing board that determined the first allegation against Plaintiff. He is sued individually and as RPI's employee/agent.

29.     Peter Konwerski, is RPI's Vice President for Student Life. Mr. Knowerski reviewed and determined Plaintiff's appeal. He is sued individually and as RPI's employee/agent.

30.     At all times relevant to this Complaint, all named Defendants acted intentionally and together, in concert with one another.

## <u>JURISDICTION</u>

31.     This Court has jurisdiction over this matter under 28 U.S.C § 1331 because it seeks to enforce Plaintiff's rights and remedies under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX") and the United States Constitution.

32.     This Court also has diversity jurisdiction under 28 U.S.C. § 1332 to resolve the supplemental breach of contract claims because the amount in controversy exceeds $75,000 and there is diversity of citizenship between the parties.

33.     This Court has personal jurisdiction over RPI since RPI and its employees and agents were conducting business within the State of New York and the Northern District of New York at all times relevant to this Complaint.

34.     Venue is appropriate in this Court pursuant to 28 U.S.C § 1391 as RPI is an educational institution within this district. The events regarding this matter all took place within this district.

## JURY DEMAND

35.     Plaintiff demands a trial by jury for all claims and issues raised in this Complaint.

## FACTS

36.     RPI is a college in Troy, New York with a student body of nearly 8,000 students.

37.     Prior to Plaintiff's matriculation into RPI in the fall of 2017 and during his time as a student, RPI received extensive criticism for its handling of sexual violence on campus. The criticism came from both the campus community and local media.

38.     For example, in May 2018, the *Troy Record* published an article authored by a former female RPI student titled "Reader's View: Title IX Issues At RPI Should Be On Students' Radar".  The opening paragraph of the article states "Congratulations on being accepted to RPI!...That being said, if you are a woman and are considering RPI, I urge you to consider your options."[2]

---

[2] Merrow, Hannah. "Reader's View: Title IX Issues At RPI Should Be On Students' Radar."  *Troy Record*, May 4, 2018 (https://www.troyrecord.com/news/reader-s-view-title-ix-issues-at-rpi-should-be/article_b8e31f9d-38e5-5253-8d4f-b56b6f8763a8.html) (last accessed June 16, 2019).

39.     The article warns of RPI's "archaic practices" and cautions prospective female students who may report a sexual assault to RPI that "the odds are stacked against you …[and] you will likely not succeed."[3]

40.     The article discusses how RPI has failed to hold male students accountable or to punish them sufficiently in cases of sexual misconduct. Furthermore, the article accuses RPI of "victim blaming".[4]

41.     Similarly, on July 26, 2018, the *Times Union* published an article entitled "RPI Student Recounts Alleged Assault At Frat Party" which reported that RPI's "handling of [a complainant's] allegations provides a troubling window into the issue of sexual assault on college campuses" and that this case is "emblematic of what [some people] view as the poor handling of simple assaults and other problems at RPI."[5]

42.     One RPI student was quoted in the article as saying, "Whether it's sexual assault or depression, they just didn't have the support system…At the end of the day, students don't feel comfortable reporting these issues, but it's the school's responsibility to create an atmosphere where they can report...the real problem is the school doesn't hold people accountable."[6]

43.     Similarly, upon information and belief, student protests, rallies and other public demonstrations have embarrassed RPI and its Title IX process prior to Plaintiff enrolling at RPI and these actions caused RPI to change its Title IX process in the discriminatory manner as described herein.

---

[3] Id.
[4] *Id*.
[5] Karlin. Rick. "RPI Student Recounts Alleged Assault At Frat Party." *Times Union*, July 26, 2018. (https://www.timesunion.com/news/article/RPI-rape-victim-speaks-out-Don-t-punish-Greeks-13082051.php) (last accessed June 16, 2019).
[6] *Id*.

44.     In sum, prior to the underlying allegations being made against Plaintiff, RPI, its faculty, administrators and staff were accused of being indifferent to sexual violence by the student body and the community.

45.     Specifically, RPI, its faculty, administrators and staff were accused of not holding male perpetrators of sexual misconduct responsible and for being lenient to men found responsible for sexual violence on campus.

46.     At or around the same time, RPI faced pressure from the federal government and the State of New York to do more to combat sexual violence on campus.

47.     Relatedly, upon information and belief, RPI was investigated by the Office of Civil Rights of the U.S. Department of Education and/or Department of Justice for its mishandling of sexual assault investigations, in particular with the way it handled female complainant's claims.

48.     Upon information and belief, RPI feared this criticism, scrutiny and pressure would result in the loss of federal funding.

49.     In response, RPI crafted an aggressive and discriminatory policies and procedures designed to disregard the due process rights of male students in an attempt to quell the negative public relations and public pressure.

### RPI Responds to the Pressure and Creates the Discriminatory Regime

50.     Upon information and belief, in the face of this criticism and pressure, RPI changed the way it investigated and adjudicated allegations of sexual misconduct including its Title IX process.

51.     Upon information and belief, in the face of this criticism and pressure, RPI also changed the way it trained its students, faculty and staff about sexual assault, the psychology of sexual assault and the sexual assault resolution process.

52.     Upon information and belief, the changes and pressure described above caused RPI to develop an education, training, investigation, adjudication and resolution process that was directly and indirectly designed to discriminate against male students on the basis of their sex by:

a)      Creating the false impression in the minds of students, faculty, staff, investigators and adjudicators, that male students are responsible for sexual violence and prone to engage in acts of sexual violence;

b)      Creating an environment and culture in which a male student's word is less credible than a female student's word simply because he is accused of sexual misconduct; and

c)      Creating a system and process by which more male students are found responsible for allegations of sexual violence without regard to due process, RPI's own policies and procedures, an equal opportunity to be heard or competent evidence.

**The Biased Training and Education**

53.     One of the changes that gave rise to this discriminatory process, relates to the sexual assault training and education of RPI's students, faculty, administrators and staff were required to take.

54.     Upon information and belief, this training and education was discriminatory against male students in that it explicitly, implicitly and wrongly portrayed male students as being predisposed to be the perpetrators of sexual misconduct.

55.     The training was discriminatory against male students because it was also based on unfounded and unsupported "scientific" findings that directly and indirectly determined that men were the cause of and responsible for sexual misconduct at RPI and in society generally.

56.     Additionally, the training and education fostered and developed an environment in which a male student's statements and evidence were deemed less credible than a female student's simply because of their different sexes.

57.     In addition, RPI's Title IX investigators and adjudicators received "specialized training" regarding sexual violence and misconduct.

58.     At the outset of the initial investigation, Mr. Hardy advised Plaintiff and his advisor that the Title IX investigators and adjudicators had received "special training" to handle complaints of sexual misconduct.

59.     Upon information and belief, the "specialized training" emphasized the unfounded and gender-biased assumptions that reemphasized that men were responsible for sexual violence and that they are less credible than woman-complainants in sexual assault investigations.

60.     Upon information and belief, this "specialized training" also explicitly and implicitly instructed Title IX investigators and adjudicators to use unfounded "scientific" conclusions and findings as bases for developing evidence against men in sexual

misconduct investigations and for holding men responsible for allegations of sexual misconduct.

61.     Upon information and belief, the "specialized training" taught Title IX investigators and adjudicators that evidence supporting a Complainant's allegation was more relevant, probative and valuable than a Respondent's evidence in defense.

62.     Upon information and belief, the "specialized training" was not designed to train investigators and adjudicators to objectively collect, weigh and consider evidence, but to collect, seek out and give unjustified weight to evidence that inevitably leads to the conclusion that men are responsible for committing sexual assaults.

63.     This training and education created an environment at RPI in which male students are presumed responsible for sexual violence.

64.     This training and education also created an environment in which objective investigations into allegations of sexual assault are impossible since inherent in the training and education is the explicit and implicit assumption that male students are perpetrators of sexual violence.

65.     Furthermore, this training and education instructed RPI's Title IX investigators and adjudicators, both directly and indirectly, to give greater weight to a female complainant's allegations than a male student's statements, evidence and defenses.

66.     Upon information and belief, each of the named defendants received the "specialized" or similar training and education.

67.     Upon information and belief, some of the named defendants were responsible for developing, executing and administering the training and education to

students, faculty and staff and the "specialized training" to investigators and adjudicators described above.

68.    As one example of these discriminatory changes made in response to the above pressure, RPI created and published a Student Sexual Misconduct Bill of Rights ("Bill of Rights"). [7]

69.    While the Bill of Rights claims to outline the rights "all students" have at RPI, its language establishes that RPI considers the rights of the Complainant (who are overwhelmingly female students at RPI) to be greater than the Respondent's (who are overwhelmingly male students at RPI).

70.    Despite its prefatory language, the Bill of Rights provides critical rights for Complainants with no reciprocal right for Respondents.

71.    For example, the sixth (6th) right ("6th Right") states that all students are "free from the suggestion that the reporting individual is at fault **when these crimes and violations are committed**, or should have acted in a different manner **to avoid such crimes or violations**." (emphasis supplied).

72.    The only interpretation of the 6th Right is that it applies to Complainants and specifically to a Complainant's conduct related to an allegation.

73.    There is no explicit reciprocal right for accused students.

74.    Without a reciprocal right to the presumption of innocence,[8] male students, are denied due process and the purported fair process espoused by RPI since the "Bill of Rights" presumes that crimes and violations occur when reported by a Complainant.

---

[7] *Student Sexual Misconduct Bill of Rights*. Available at: https://sexualviolence.rpi.edu/student-sexual-misconduct-bill-rights (last visited June 16, 2019).

75.     The 6th Right is further discriminatory because it promises that a Complainant's conduct will not be held against the Complainant when determining the validity of an allegation.

76.     Such a "right" prevents investigators and adjudicators from looking at relevant information when making determinations of factual and legal sufficiency (i.e. whether what is alleged is a violation and/or whether the violation is established by a preponderance of the evidence).

77.     Such a "right" also prevents accused students, like Plaintiff, from defending themselves by precluding them from asking investigators and adjudicators to consider the relative fault and/or actions of the Complainant when considering the merits of the allegation.

78.     Similarly, the eighth (8th) right ("8th Right") states that "all students have the right to be protected from retaliation by the institution, any student, **the accused and/or the respondent, and/or their friends, family and acquaintances** with the jurisdiction of the institution." (emphasis supplied).

79.     The 8th Right specifically singles out "respondents, their friends, families and acquaintances" but does not expressly afford similar protections to accused students, like Plaintiff.

80.     These examples demonstrate RPI's explicit and implicit sexually discriminatory intent.

---

[8] While RPI's Policies and Procedures states that it presumes the Respondent's innocence, its failure to include such a presumption in the Bill of Rights demonstrates the subordination of a Respondent's rights to a Complainant's.

81.     Such  sexually  discriminatory  intent,  presumptions  of  guilt,  and
presumptions  that  female  complainant's  evidence  and  allegations  are  inherently  more
credible  and  valuable  than  a  male-respondent's  defenses  and  related  evidence  is  contrary
to  due  process  and  Title  IX.

### The Changes Work:
### Allegations and Findings Against Male Students Soar

82.     As  a  direct  result  of  RPI  adopting  the  discriminatory  and  biased
investigation  and  adjudication  process  described  above,  more  male  students  were
investigated  for  violations  of  RPI's  sexual  misconduct  policies,  more  male  students  were
found  responsible  for  violating  RPI's  sexual  misconduct  policies  and,  upon  information
and  belief,  sanctions  and  punishments  increased  against  male  students.

83.     In  just  the  three  years  following  these  discriminatory  changes,  reports  of
sexual  misconduct  at  RPI  nearly  doubled  from  19  in  the  2015-16  academic  years  to  37  in
2016-17  academic  year,  and  doubled  again  to  74  in  2017-2018.  This  is  a  400%  increase.
RPI's,  own  2017-2018  Title  IX  Summary  graphically  depicted  this  increase  with  the
below  diagram. [9]

---

[9] 2017-2018 RPI Title IX Report available at: https://info.rpi.edu/greek-life-task-force/2017-2018-title-ix-summary; last visited June 13, 2019.

{O0423546.1}



84.     Of the 74 reported cases of sexual misconduct in 2017-2018, 60 or 81% of the "Respondents" (accused students) were male students and only 6 or 8% were female students.[10]

85.     It is clear, therefore, that RPI's gender-biased training, education and Title IX process is achieving the desired result of punishing more male students for alleged sexual misconduct.

86.     Not only have sexual assault allegations against male students increased dramatically over the last two years at RPI, but upon information and belief, the number of male students held responsible for sexual violence has likewise dramatically increased.

87.     Upon information and belief, the sanctions imposed on male students have also increased because of the sexually discriminatory changes described herein.

88.     Male students, like the Plaintiff, are being disparately impacted by RPI's discriminatory education, training and investigation and adjudication process solely based on their sex.

---

[10] *Id.* The remaining percentage of respondents is categorized as "Unknown/Other."

89.     In 2017-2018 alone, eight times more male students were accused of sexual misconduct on RPI's campus than female students.[11]

90.     These gendered and disparate results were caused by the discriminatory Title IX process, regime, culture and environment created by RPI which discriminates against men based on their sex.

91.     RPI incorporated its training, education and biased presumptions and inferences findings into its Title IX process and, as such, has created an investigation and enforcement regime that discriminates against men based solely on their gender.

92.     As described below, Plaintiff as a male student, suffered and continues to suffer under RPI's discriminatory regime because of his sex.

## THE FIRST ALLEGATION AGAINST PLAINTIFF

93.     On October 1, 2018, with no warning, advice or context, Plaintiff received an email from RPI's Assistant Vice President of for Student Life and Dean of Students, Defendant, Travis Apgar (Defendant Apgar), ordering Plaintiff to have no contact with a named female Complainant because the she alleged that Plaintiff violated RPI's Student Sexual Misconduct Policy.

94.     The Order provided no factual context for the allegation and did not state what provisions of the Student Sexual Misconduct Policy were allegedly violated.

95.     Plaintiff immediately replied to Dean Apgar, denying any misconduct and requesting a meeting with various RPI administrators and officials.

---

[11] *Id.*

{O0423546.1}

17

96.     In his response, Plaintiff provided details regarding his dealings with Complainant and, in particular, described a recent contentious debate that he and Complainant had engaged in at a school club meeting regarding Justice Kavanaugh's confirmation hearings.

97.     Soon thereafter, Plaintiff received an email from Jackie Turner, Deputy to the Vice President and Title IX Coordinator, that attached a formal notification of the allegations against Plaintiff.

98.     Plaintiff did not review the formal notification prior to sending his initial denial to Dean Apgar.

99.     Ms. Turner's letter notified Plaintiff that he was alleged to have "kissed a female student and squeezed her neck, obstructing her breathing, without her affirmative consent" at an outdoor location on RPI's campus. Plaintiff was also notified that he was accused of holding "the same female student down on a bed, preventing her from leaving" and making contact with the genitals with his hand without her affirmative consent."

100.    Neither alcohol nor controlled substances were alleged to have been involved.

101.    Soon thereafter, Plaintiff hired O'Connell and Aronowitz, P.C., as private legal counsel to serve as his advisor during these proceedings as allowed under RPI's Policies and Procedures.

102.    Through counsel, Plaintiff promptly requested that RPI preserve all surveillance footage and swipe card data associated with the September 20th allegation. A detailed description and timeline of every location Plaintiff had been with the

Complainant was provided to RPI to facilitate identifying and preserving relevant information.

103.    On October 9, 2018, Larry Hardy, RPI's Director of Employee Relations and Professional Development and Title IX Coordinator/ADA Coordinator provided Plaintiff with an amended notification.

104.    The October 9th notification now also alleged that on September 22, 2018 Plaintiff repeatedly kissed Complainant without her consent in downtown Troy.

105.    Immediately after receiving the amended notification, through counsel, Plaintiff retained a private detective to attempt to obtain surveillance footage from in and around the area the Complainant alleged Plaintiff repeatedly kissed her downtown Troy, New York.

### The Initial Investigation and the
### Biased Collection of Evidence

106.    RPI assigned a Title IX investigator, Elizabeth Brown-Goyette and Public Safety Officer Matthew Lewis to investigate these allegations.

107.    Upon information and belief, Ms. Brown-Goyette was assigned as the lead investigator.

108.    Upon information and belief, Defendant Brown-Goyette received the biased, discriminatory sexual assault training and education described above.

109.    During her investigation Ms. Brown-Goyette met with the Complainant; her mother and a series of Complainant's friends and acquaintances.

110.    None of these individuals witnessed any of the alleged conduct and only some of them directly observed the Complaint's demeanor immediately following her interactions with Plaintiff on September 20th and 22nd.

111.    Through the interviews of irrelevant witnesses, Ms. Brown-Goyette sought and obtained inflammatory, unsupported and prejudicial information from five witnesses who were either the Complaint's friends or family.

112.    These witnesses offered no relevant information about the actual allegations, only disparaging commentary about Plaintiff and hearsay bolstering the Complainant's account. For example, one witness offered the following testimony in response to Ms. Brown-Goyette's questioning:

> "...like something struck me when I first met [Plaintiff] as being off. But I never thought it would be that malicious. But I've heard other people say...like through other like friends compared other stories of like how [Plaintiff] was kind of weird and they always got a creepy vibe from him."

113.    Another friend of the Complainant referred to Plaintiff as simply that "weird guy" in response to Ms. Brown-Goyette's questions.

114.    The product of Ms. Brown-Goyette's biased questioning is replete with this kind of irrelevant, inflammatory and prejudicial testimony.

**RPI Withholds Evidence from Plaintiff**

115.    Ms. Brown-Goyette also obtained information from an anonymous witness, whose identity was withheld from Plaintiff, despite Plaintiff's demands that the identity be disclosed.

116.    The anonymous witness was only identified as "Witness A".

117.    Mr. Hardy denied Plaintiff's request for Witness A's identity without explanation or justification.

118.    Plaintiff was therefore unjustly and improperly denied the opportunity to interview and speak with a potential witness and otherwise develop helpful information from this witness.

119.    Upon information and belief, Witness A's identity was known to the Complainant.

120.    Ms. Brown-Goyette also obtained testimony from another witness whose entire testimony was redacted and therefore unable to be reviewed by Plaintiff or his counsel.

121.    The redaction denied Plaintiff the right to review the complete investigation report as promised in the Policies and Procedures.

122.    Mr. Hardy provided no justification or reasoning for redacting the testimony except telling Plaintiff's counsel, "You're not getting it."

123.    Upon information and belief, the Complainant had knowledge of the content of the redacted testimony.

124.    Upon reviewing the transcripts of these interviews, Plaintiff, through counsel, objected to the inclusion in the investigatory report and the Hearing Board's consideration of the irrelevant, prejudicial, anonymous and redacted information collected by Ms. Brown-Goyette.

125.    Upon information and belief, the redacted testimony was provided to and considered by RPI's Case Management Team prior to making its determination that the allegations should be referred to the Hearing Board.

126.    Upon information and belief, Witness A's identity was known to the Case Management Team prior to making its determination.

127.    The collection and inclusion of the above-described irrelevant, inflammatory, prejudicial, anonymous and redacted information in the investigatory report was a direct result of the biased training Ms. Brown-Goyette has received and evidences her inability to objectively investigate allegations of sexual misconduct or investigate in a manner that is not biased against male Respondents.

128.    The Case Management Team's consideration of the irrelevant, inflammatory and prejudicial information produced by Ms. Brown-Goyette, demonstrates its inability to objectively adjudicate and consider allegations of sexual misconduct in a manner that is not biased against male Respondents.

129.    Mr. Hardy's refusal to make the identity of Witness A known to Plaintiff demonstrates the biased and sexually discriminatory process Plaintiff was subjected to.

130.    Similarly, Mr. Hardy's refusal to allow Plaintiff access to the redacted testimony demonstrates the biased and sexually discriminatory process Plaintiff was subjected to.

131.    Plaintiff's inability to review and access the redacted information or learn the knowledge of Witness A placed him a disadvantage.

**Plaintiff's Interview with RPI**

132.    On October 23, 2018, Plaintiff voluntarily consented to an interview with Ms. Brown-Goyette and Officer Lewis, an RPI campus police officer.

133.    Plaintiff's interview occurred months before he would be permitted to review any of the testimony and "evidence" collected by Ms. Brown-Goyette. At the time of the interview, Plaintiff had never met Ms. Brown Goyette or Officer Lewis.

134.    The interview was audio recorded and later transcribed. The recording and transcript remain in RPI's exclusive control and Plaintiff was not permitted to make copies, but was permitted to review the transcript months after the interview.

135.    During the interview, Plaintiff provided a detailed written summary of the relevant events, complete with text messages between himself and the Complainant and a map detailing where he and the Complainant were at various points on the night of September 20th and the afternoon of September 22nd.

136.    Plaintiff also provided pictures of the three (3) emergency towers and the public safety building that he and Complainant passed while returning to his dorm room on the night of September 20th after the Complainant alleged that Plaintiff supposedly choked her in the parking lot.

137.    During the interview, Plaintiff denied any wrong doing and described how he knew he had the Complainant's affirmative consent at each stage of their encounters on September 20th and 22nd.

138.    Plaintiff stated that all contact in his dorm room was with Complainant's clear and unequivocal affirmative consent, was mutual and reciprocated.

139.    Consistent with his knowledge that all contact was with Complainant's clear and unequivocal affirmative consent on the night of September 20th, Plaintiff provided Ms. Brown-Goyette a text message exchange initiated by the Complainant.

Starting at 10:15 am, Complainant sent a text message to Plaintiff wishing him luck at the career fair with a smiley face emoji.

140.     This message was unsolicited by Plaintiff.

141.     Plaintiff and Complainant exchanged multiple text messages throughout the day of September 21st. At no time during any of these exchanges did the Complainant give any indication that she was upset, hurt, concerned or offended by Plaintiff's conduct the night before. Indeed, the Complainant initiated several of their exchanges.

142.     To the contrary, Plaintiff reasonably believed their correspondence was friendly and flirtatious - consistent with their last interaction the night before.

143.     Below is an exact copy of a portion of the messages exchanged between Complainant (grey messages – on left side of screen) and Plaintiff (blue messages along right side of screen) from Friday, September 21st (the morning after the alleged assault):



144.    These messages were exchanged **after** it was alleged Plaintiff strangled and sexually assaulted the Complainant.

145.    On Saturday, September 22nd, at 10:31 AM, Plaintiff asked Complainant by text message if she would like to join him at the Troy's Farmer's Market.

146.    The Complainant agreed to meet Plaintiff at 1:15. Her responses included smiley face emojis and exclamation marks.

147.    Complainant even offered to pick Plaintiff up and give him a ride to the Farmer's Market.

148.    Ultimately, the Complainant voluntarily came to Troy and met Plaintiff at the Whistling Kettle. Plaintiff bought her tea, they walked around the Farmer's Market and then went to the Psychedelic Delicatessen where Plaintiff got them more refreshments.

149.    Plaintiff also attempted to coordinate a meeting with his sister but was unable to do so. Soon thereafter, Plaintiff walked with Complainant to her car where he hugged her good bye.

150.    Plaintiff denied kissing, let alone kissing the Complainant multiple times that day without her affirmative consent as alleged.

151.    At no time did the Complainant tell Plaintiff that any of Plaintiff's conduct on the 20th or 22nd was improper or non-consensual.

152.    After providing this account to Ms. Brown-Goyette, Plaintiff requested that she speak to several witnesses including Plaintiff's sister.

153.    Plaintiff's sister was a critical witness because she could speak to Plaintiff's demeanor on Friday, September 21st, where Plaintiff expressed that he liked

the Complainant and was excited to get to know her and potentially spend more time with her.

154.    Additionally, Plaintiff's sister could corroborate Plaintiff's attempts to set up a meeting between her and the Complainant. Without explanation, Ms. Brown-Goyette failed to interview Plaintiff's sister.

155.    Ms. Brown-Goyette's decision not to interview Plaintiff's sister was intentional and the product of her and RPI's gender bias and the "specialized training" she received that is described above.

156.    Ms. Brown-Goyette's decision not to interview Plaintiff's sister prejudiced Plaintiff for two independent reasons:

a)    The Complainant's statements and those of some of her "witnesses", accused Plaintiff of using the opportunity to meet his sister as a ruse to lure her to downtown Troy to spend time alone with him. Had Ms. Brown-Goyette spoken with Plaintiff's sister, she could have determined the efforts Plaintiff made to get the Complainant to meet Plaintiff's sister and could have incorporated that information in her investigative report to provide a fair and objective assessment, dispelling the assumption that Plaintiff was using his sister as a "ruse".

b)    As a result of Ms. Brown-Goyette's decision not to interview Plaintiff's sister, this information was not included in her report and therefore the Case Management Team did not consider it. Furthermore, the Hearing Board members were able to review this biased, uncontradicted narrative prior to hearing any testimony. Accordingly, the Complainant's allegation that the meeting was a

ruse to trick her into spending time with Plaintiff, went unchallenged until well into the disciplinary hearing.

### Discriminatory and Faulty Training Leads to Biased Investigations and Credibility Determinations

157.   Sometime after her interview with Plaintiff, Ms. Brown-Goyette submitted to the Case Management Team her investigatory report.

158.   Upon information and belief, the report contained an unredacted copy of the transcript which Plaintiff was not allowed to review and the identity of Witness A.

159.   It also included her own biased and subjective credibility determination that the Complainant was more credible than the Respondent.

160.   This credibility assessment is sexually discriminatory and was the product of the "specialized training" she received from RPI.

161.   Ms. Brown-Goyette based her credibility assessment on the fact that she believed Plaintiff's timeline and statements were not consistent when compared to the Complainant's.

162.   Critically, however, Ms. Brown-Goyette acknowledged the Complainant's inconsistencies own inconsistencies, particularly concerning her recollection of the severity of the alleged conduct.

163.   Ms. Brown-Goyette's credibility assessment demonstrates that she was not capable of objectively investigating, weighing or presenting the facts relevant to the investigation since she presumed that a female-complainant's allegations are more credible than male-respondents version of events.

164. Indeed, a review of the Complainant's reports to her friends and family in the days and weeks following her interactions with the Plaintiff demonstrates a steady and marked increase in the severity of the allegations she was making.

165. Nonetheless, Ms. Brown-Goyette determined that inconsistencies by victims of the sexual trauma, like the Complainant's inconsistencies, are to be expected and, is evidence of sexual trauma.

166. In support of this determination, Ms. Brown-Goyette cited to two publications:

a) *Victim Impact: How Victims Are Affected by Sexual Assault and How Law Enforcement Can Respond;* and

b) *What SARTS Should Know About Sexual Violence.*

167. The information in these publications is based on unfounded scientific principals and/or is gender biased.

168. In particular, references to tonic immobility, freezing or other brain-based responses to trauma are not competent or reliable information, nor is Ms. Brown-Goyette sufficiently trained to interpret or apply the principals described therein to this investigation.

169. Nonetheless, by citing these publications, Ms. Brown-Goyette introduced expert, or at the very least specialized evidence, against Plaintiff.

170. Upon information and believe, the hearing Board ultimately considered Ms. Brown-Goyette's investigatory report and her citations to this evidence.

171. Ms. Brown-Goyette's credibility determination is the product of the biased "specialized training" described above.

172.    Ms. Brown-Goyette's application of the content of these publications to her investigation report demonstrates her partiality, gender bias, and inability to conduct an objective investigation.

173.    RPI's acceptance of Ms. Brown-Goyette's interpretation of these publications demonstrates the biased and discriminatory nature of its investigatory and adjudicatory regime.

**RPI Uses a Baseless Second Allegation
to Bolster the First**

174.    On October 31, 2018, eight days after Plaintiff was interviewed by Ms. Brown-Goyette, Plaintiff received a letter from Mr. Hardy notifying him that he was accused of a second, more serious allegation of sexual misconduct (ultimately, Plaintiff was exonerated of this allegation).

175.    RPI now accused Plaintiff of forcefully raping a female RPI student in February of 2018, more than eight (8) months earlier.

176.    The allegation was made on RPI's own initiative and against the wishes of the female student involved (Student #1).

177.    Student #1 was approached by Ms. Brown-Goyette under the false pretense that Student #1 had information relevant to the first allegation.

178.    At the time that Ms. Brown-Goyette solicited Student #1's testimony, she knew that Student #1 had no relevant information related to the first allegation.

179.    Ms. Brown-Goyette sought Student #1's testimony under false pretenses to obtain additional irrelevant and prejudicial information to bolster her investigation into Complainant's allegations.

180.     Ms. Brown-Goyette's discriminatory and biased intent is evidenced by the fact that during her interview of Student #1, Ms. Brown-Goyette did not ask a single question related to the allegations of September 20 and 22, 2018.

181.     Instead, Ms. Brown-Goyette asked only questions about Student #1's experience with Plaintiff.

182.     Ms. Brown-Goyette undertook this interview as part of her investigation into the first allegation to improperly bolster Complainant's allegations and Ms. Brown-Goyette's pre-determined findings.

183.     Upon information and belief, Student #1's interview was the redacted transcript included in Ms. Brown-Goyette's investigation report that Plaintiff was unable to review while preparing to defend the first allegation. This transcript was only made available to Plaintiff in May of 2018 after he was notified that he was exonerated of the second allegation.

184.     Student #1 did not wish for RPI to open an investigation into her interaction with Plaintiff, but RPI did so on its own accord, despite Student #1's wishes and even though there was no evidence of sexual misconduct.

185.     Ms. Brown-Goyette then included information gathered from Student #1 in her investigation of the First Allegation despite its irrelevance and its prejudice.

186.     Upon information and belief, the Case Management Team subsequently considered this irrelevant, prejudicial material of the Second Allegation when making its determination of whether to refer the First Allegation to a hearing.

187.    The inclusion and consideration of this information also violated RPI stated policies which prohibits a student's past sexual behavior to be used against him or her in a subsequent proceeding.

188.    As a result on the Second Allegation, Plaintiff had to prepare his defense and endured extreme stress and anxiety related to this new allegation.

189.    Plaintiff also had to expend tremendous time, effort and energy away from his studies to simultaneously defend two allegations.

190.    Plaintiff was also forced to incur additional attorney's fees and expenses related to defending the Second Allegation.

191.    As part of the notification for the Second Allegation, Plaintiff was advised that Ms. Brown-Goyette was assigned as the Title IX investigator.

192.    Plaintiff, through counsel, promptly objected to Ms. Brown-Goyette serving as the investigator for both matters, and raised concerns about her ability be an impartial investigator, as guaranteed under RPI's Policies and Procedures.

193.    RPI denied Plaintiff's objection and Ms. Brown-Goyette continued to serve as the investigator for both the first and second allegations.

194.    On November 30, 2019, Plaintiff submitted to an interview with Ms. Brown-Goyette regarding the Second Allegation.

195.    Plaintiff provided a detailed written summary of the consensual sexual encounter he had with Student #1 in February 2018.

196.    Plaintiff's account was corroborated by Student #1's narrative.

197.    Ms. Brown-Goyette did not interview any other witness besides Plaintiff and Student #1, even though Plaintiff identified potential witnesses who could corroborate certain aspects of his encounter with Student #1.

198.    On May 28, 2019, seven months after notifying Plaintiff of its unilateral decision to investigate the allegation, RPI advised Plaintiff that the case was closed with no finding against him.

199.    Ms. Brown-Goyette's failure to interview any additional relevant witnesses, combined with RPI's decision to pursue the allegation against Student #1's wishes demonstrates that the Second Allegation and investigation was brought and carried out by RPI, Ms. Brown-Goyette and the Case Management Team in bad faith.

### Plaintiff Suffers Improper Retaliation And RPI Fails to Act

200.    Soon after being accused by Complainant, Plaintiff started experiencing retaliation from students affiliated with the Complainant.

201.    Upon information and belief, Complainant and her associates (likely those interviewed by Ms. Brown-Goyette) undertook a campaign to ruin Plaintiff's reputation on campus.

202.    Plaintiff was socially ostracized on campus.

203.    Insidious rumors were spread through RPI's student body that Plaintiff was a rapist, a bad person, dangerous and someone to be avoided.

204.    Plaintiff learned from a close friend that his name was "good as mud" around campus.

205.    The retaliation increased after RPI began its investigation into the baseless Second Allegation.

206.    This retaliation is prohibited by RPI's Sexual Assault Policies and Procedures § III(G).

207.    An essential reason for RPI's anti-retaliation policy is to protect the integrity, fairness and objectivity of the underlying investigation.

208.    On November 14, 2018 during an in person meeting with Larry Hardy, Plaintiff and his counsel complained to Mr. Hardy about the retaliation that he was experiencing on campus; that it was negatively impacting his ability to enjoy being a student in good standing at RPI; that he felt ostracized and isolated on campus; that it was adding unwanted and unnecessary stress and anxiety to Plaintiff's already stressful situation; and concern that the integrity, fairness and objectivity of the investigation was being damaged by the Complaint's and her associates' failure to maintain the privacy of the proceedings as required under the Policies and Procedures.

209.    Plaintiff requested RPI's intervention to stop the retaliation.

210.    On November 18th, Plaintiff provided a detailed accounting of the retaliation to Mr. Hardy in writing and renewed his request for RPI's intervention and assistance.

211.    Upon information and belief, RPI took no action in response to Plaintiff's retaliation complaints.

212.    Upon returning from the Thanksgiving Holiday, Plaintiff continued to experience retaliation.

213.   As a result of the stress and anxiety caused by the retaliation, Plaintiff required the treatment of a medical physician.

214.   Since RPI failed to take any discernible action in response to Plaintiff's November 14th and 18th retaliation complaints, on November 29, 2018, Plaintiff, through counsel, sent a third request for intervention and action by RPI.

215.   In the November 29th request, Plaintiff's counsel advised Mr. Hardy that RPI's "decision to thus far not enforce its anti-retaliation policy or otherwise accommodate [Plaintiff's] request for RPI's advice/or intervention is harming [Plaintiff] in multiple ways" including trying to make Plaintiff's experience so intolerable that he would simply leave RPI and stop defending himself.

216.   The next day, November 30, 2018, Larry Hardy advised Plaintiff that he was opening an investigation into the retaliation claim and personally interviewed Plaintiff.

217.   RPI's and Mr. Hardy's failure to promptly respond to or otherwise enforce or even investigate its anti-retaliation policy was the product of RPI's gender biased regime.

218.   If RPI's and Mr. Hardy's inaction was not directly challenged by Plaintiff's legal counsel, no action would been taken because Plaintiff is a male student.

219.   To date, Plaintiff has received no notice regarding the status of the investigation except that RPI was "working on it" as late as May 2019.

220.   RPI has failed to promptly investigate and adjudicate Plaintiff's retaliation claim as promised in its policies and procedures.

221.   RPI's and Mr. Hardy's failure to promptly investigate and adjudicate the retaliation claim is evidence of their selective enforcement and gender bias.

222.   RPI's and Mr. Hardy's failure to promptly investigate and adjudicate Plaintiff's retaliation claim is directly caused by RPI's discriminatory and biased regime.

223.   RPI's and Mr. Hardy's failure to promptly investigate and adjudicate Plaintiff's retaliation claim prejudiced Plaintiff in that:

 a) potential witnesses favorable to Plaintiff may not have their testimony preserved and memorialized;

 b) witnesses regarding the sexual misconduct allegation against Plaintiff may have been tainted or influenced by the public sentiment against him; and

 c) that Plaintiff had to needlessly endure unbearable stress, anxiety and the physical and emotional manifestations thereof.

**The First Allegation is Referred to and Goes to RPI's
Hearing Board – RPI Refuses to Allow Expert
Testimony to Refute Faulty Pseudo-Scientific Training
of its Investigators and Board Members**

224.   After considering Ms. Brown-Goyette's investigatory report, RPI's Case Management Team referred the First Allegation to a Hearing Board for disciplinary hearing.

225.   In advance of the hearing, Plaintiff, requested the Hearing Board consider certain witnesses. A critical witness was Dr. Jacqueline Bashkoff, Ph.D., who would have provided expert testimony on a variety of issues involving the psychology of sexual assault and offered rebuttal evidence to Ms. Brown-Goyette's investigative report.

226.    Specifically, the Hearing Board was advised that Dr. Bashkoff would provide the following relevant testimony regarding:

a)      The credibility and application of the psychology and science referenced in the publications cited by Ms. Brown-Goyette;

b)      The misapplication of what is generally characterized as the counter-intuitive behaviors of sexual assault victims; things such as minimizing the event; "Frozen Fright" and/or "tonic immobility"; and Disassociation and dream like detachment, which are referenced in the publications cited by Ms. Brown-Goyette.

c)      The malleability of memory, especially when an individual is encouraged by people close to them that what the individual experienced is more significant or different than what the individual initially reported. (This is relevant based on Complainant's evolving recollection of what occurred as she spoke to more friends, family, investigators and counselors).

d)      To rebut the "specialized training" Ms. Brown-Goyette and the Hearing Board members received, because many aspects of the training was believed to be misleading and placed Plaintiff, as a male, accused student, at an extreme and unfair disadvantage.

227.    Prior to the hearing, Plaintiff requested Mr. Hardy and RPI disclose the specialized training its Board members and investigators received. That request was denied.

228.    This expert and rebuttal testimony was critical to Plaintiff's defense because Ms. Brown-Goyette's investigatory report relied on her credibility

determinations which were materially impacted by the biased and discriminatory training she received.

229.    Dr. Bashkoff would have been able to rebut this evidence and provide the Hearing Board with relevant, competent evidence to consider when evaluating the Complainant's allegation and the evidence related thereto.

230.    Mr. LeNorman Strong was the chair of the Hearing Board.

231.    Through Mr. Strong, the Hearing Board refused to allow Dr. Bashkoff to testify.

232.    The Hearing Board's refusal to consider this evidence is directly attributable to RPI's biased and discriminatory regime.

233.    Furthermore, Hearing Board's refusal to consider this evidence deprived Plaintiff of presenting a defense in violation of RPI's Policies and Procedures.

234.    RPI's refusal to consider this evidence also violated Plaintiff's due process rights under Title IX.

235.    Dr. Bashkoff's testimony became especially critical for the reasons discussed below.

236.    Ultimately, the Board determined that Plaintiff committed only one of the three separate acts of sexual misconduct alleged by Complainant – that he had nonconsensual sexual contact with the Complainant on September 20th in his dorm room.

237.    Critically, the Board did not find that Plaintiff kissed and choked the Complainant in the parking lot or that Plaintiff kissed the Complainant multiple times in downtown Troy on September 22nd as alleged.

238.    The Board explained its rationale as follows:

*As the Respondent, you provided conflicting testimony about the incident. For example, in your initial written account you claim that you and Complainant only discussed philosophy outside and then the Complainant went home. However, you and the Complainant agreed that you went to your Residence Hall room after being in the truck behind the Armory and sexual activity occurred in both locations. Your description of the timeline of incident is not consistent with other evidence provided. As a result, the Hearing Board determined that the incident in your Residence Hall room was more likely to have occurred according to the recollection of the Complainant and without the affirmative consent of the Complainant based on evidence from interview statements and text messages.*

239.    Evidence concerning the Respondent's and Complainant's comparative consistency was clearly central to the Board's deliberations and ultimate decision.

240.    This ties directly back to Ms. Brown-Goyette's investigatory report where she made a credibility determination that the Complainant was more believable than the Plaintiff because her inconsistencies are explainable by sexual trauma and are even evidence of sexual trauma.

241.    The Board received that information from Ms. Brown-Goyette, but Plaintiff was not permitted to rebut it with competent expert evidence from Dr. Bashkoff.

242.    The Board's determination was a product of RPI's discriminatory regime, its failure to follow and selective enforcement of its policies and procedures.

**The Appeal is Denied**

243.    Plaintiff timely appealed the Board's determination and raised all relevant procedural violations and errors.

244.    On May 23, 2019, Plaintiff's appeal was denied by Peter Konwerski, Vice President for Student Life.

245.    As a consequence, RPI imposed the sanction of Suspension and *persona non grata* status on Plaintiff.

246.    Additionally, Plaintiff's transcript has now been marked with a finding that he committed sexual misconduct.

247.    Plaintiff will be unable to return to campus or register for classes in the fall 2019 term.

248.    Plaintiff has suffered and continues to suffer the humiliation, stress, anxiety and related medical and psychological issues created by RPI's discriminatory and biased regime.

249.    Plaintiff has suffered and will continue to suffer irreparable harm because of RPI's erroneous, biased and discriminatory determination.

250.    Plaintiff has been severely and irreparably damaged by the suspension, the retaliation and RPI's discriminatory and biased investigations. His academic and professional future is now at risk because of the notation contained on his academic transcript. His ability to enjoy and be with his friends and classmates and graduate with them, will be irreparably taken from him without this Court's intervention.

251.    Consequently, Plaintiff brings this action to obtain the relief requested herein.

### AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendment of
### 1972 ("Title IX")
### Erroneous Outcome

252.    Plaintiff repeats and realleges all prior allegations.

253.    Title IX provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal Financial Assistance."

254.    Upon information and belief, RPI received Federal Financial Assistance at all times relevant to this Complaint.

255.    Both the U.S. Department of Justice and the U.S Department of Education have issued regulations under Title IX that require schools, including RPI, to "adopt grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any actions which would be prohibited" by Title IX or its accompanying regulations.[12]

256.    Under Title IX and its accompanying regulations, RPI is required to adopt procedures that ensure the Title IX rights of the complainant and provide due process to both parties involved.

257.    Based on the forgoing, the Defendants have deprived Plaintiff of his rights to Due Process, fundamental fairness, and equal protection under Title IX through the improper administration, execution, interpretation and application of its Policies and Procedures on the basis of Plaintiff's sex.

258.    Furthermore, Defendants have deprived plaintiff of his rights to Due Process, fundamental fairness, and equal protection under Title IX on the basis of his sex by creating a sexually discriminatory environment and culture biased against male students generally and the Plaintiff individually, through the biased training and

---

[12] 34 C.F.R. § 106.8(b) (U.S. Dept. of Education); 28 C.F.R § 54.135(b) (U.S. Dept. of Justice)

education of its students, faculty, staff and the "specialized training" it requires for its investigators and adjudicators.

259.    Defendants conducted their investigation and adjudication of the events of September 20 and 22, 2018 in a manner that was biased against the Plaintiff because of his sex. The Defendants' finding was erroneous and failed to consider critical, relevant evidence on a key issue in the case.

260.    Defendants deprived Plaintiff of his rights to Due Process fundamental fairness, and equal protection under Title IX on the basis of his sex by denying him access to redacted testimony and the name of an anonymous witness that was known to the Complainant and considered by RPI during its deliberative process.

261.    Defendants further deprived Plaintiff of his rights to Due Process fundamental fairness and equal protection under Title IX on the basis of his sex by failing to timely respond to, investigate or take prompt action on Plaintiff's retaliation claim.

262.    In doing so, the Defendants have denied Plaintiff his Title IX rights as both the accused and the accuser.

263.    Defendants have further violated Title IX by failing to act likely to prevent retaliation against male students on RPI's campus. As a result of its inaction, RPI has created an environment in which an accused male student is fundamentally denied the due process rights guaranteed to him under Title IX and the right to be free from retaliation under RPI's Policies and Procedures.

264.    Such a process has arbitrarily and selectively denied Plaintiff numerous rights, educational and extracurricular opportunities and benefits at RPI based on his sex alone.

{O0423546.1}

41

265.    RPI's policies and procedures, and the training associated therewith for students and staff alike, demonstrate Defendants investigate and adjudicate Title IX complaints with gender-bias against male students.

266.    Both the first and second allegations, as well as Defendants' failure to take Plaintiff retaliation claim seriously, are the product of Defendants' gender discrimination against Plaintiff as a male RPI student.

267.    Based on the forgoing, Defendants' Policies and Procedures and their sexual assault training and education, including the "specialized training" discriminates against men and Plaintiff because he is a man.

268.    Based on the forgoing, male students at RPI, like Plaintiff, in sexual assault cases, like Plaintiff's, are discriminated against during the investigation and adjudication of sexual assault allegations solely on the basis of their sex in violation of Title IX.

269.    Male students, like Plaintiff, are subjected to a process biased against them and carried out under a presumption of guilt, which deprives male students generally and Plaintiff specifically, of their right to defend themselves and bring counter claims – such as Plaintiff's claim of improper retaliation. Defendants thus deny male students generally, and Plaintiff here, even the most basic Due Process rights as guaranteed under Title IX.

270.    As a result of the foregoing, RPI's determination was erroneous and contrary to the facts, the Policies and Procedures and Tile IX.

271.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all transcript notations and references in his

student files to this biased outcome and the immediate termination of the suspension arising from the underlying proceeding.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendment of**
**1972 ("Title IX")**
**Selective Enforcement**

272.   Plaintiff repeats and realleges all prior allegations.

273.   Title IX prohibits the Defendants from choosing what allegations to investigate and resolve based on the sex of the Complainant.

274.   As described above, the Defendants have failed to take timely and appropriate action to resolve the prejudicial and harmful retaliation reported by Plaintiff in violation of Title IX.

275.   Defendants' failure to take timely and appropriate action to resolve the prejudicial and harmful retaliation reported by Plaintiff also violates Defendant's own policies and procedures which promises that RPI will take timely and prompt action in response to Complainants brought by its students.

276.   This failure also violated RPI's Student Bill of Rights which guarantees that all students will be treated equally and be free from retaliation.

277.   In failing to act on Plaintiff's complaint, but by actively pursuing claims against him, Defendants selectively enforced its Policies and Procedures and Student Bill of rights because he is a male student.

278.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all transcript notations and references in his

student files to this biased outcome and the immediate termination of the suspension arising from the underlying proceeding.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract

279.    Plaintiff repeats and realleges all prior allegations.

280.    Plaintiff entered into express and implied agreements with RPI that, in exchange for Plaintiff's substantial tuition payments, and the Parties' mutual adherence to RPI's Policies and Procedures, RPI would provide Plaintiff with undergraduate education.

281.    In doing so, RPI expressly promised and bound itself to abide by its own Policies and Procedures.

282.    As stated above, RPI's policies and procedures prohibit retaliation against a student involved in a disciplinary process under Policies and Procedures § III(G).

283.    RPI breached its contract with Plaintiff by failing to abide by and enforce its anti-retaliation policy.

284.    As a direct and foreseeable consequence of this breach, Plaintiff has sustained damages including but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injury, and other direct and consequential damages.

285.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all transcript notations and references in his

student files to this biased outcome and the immediate termination of the suspension arising from the underlying proceeding.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract

286.    Plaintiff repeats and realleges all prior allegations.

287.    Based on the forging, RPI also breached its expressed and implied agreement with Plaintiff by failing to abide by its Policies and Procedures during its disciplinary hearing process.

288.    Specifically, RPI breached its agreement by failing to follow the below policies and procedures:

a)    failing to assign a neutral Investigator as promised under § (III)(H)(10) ;

b)    failing to provide an unbiased hearing as promised under § (III)(N)(1);

c)    using Plaintiff's past sexual history and conduct history against him in breach of § (III)(S)(4) and (5);

d)    arbitrarily and capriciously denying Plaintiff's request that the hearing board consider Dr. Bashkoff's testimony in violation of Policies and Procedures Appendix A (§§ 1-3);

e)    failing to provide Plaintiff access to the Complete Investigation Record as promised under § (III)(L)(1) by redacting the entire testimony of one witness and keeping a witness anonymous; and

f)    all other procedural violations described above.

{O0423546.1}                                                    45

289.    As a direct and foreseeable consequence of this breach, Plaintiff has sustained damages including but not limited to, emotional distress, loss of educational and extracurricular opportunities, economic injury, and other direct and consequential damages.

290.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as the removal of all transcript notations and references in his student files to this biased outcome and the immediate termination of the suspension arising from the underlying proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, for the forgoing reasons, Plaintiff demands judgment against the Defendants as follows:

1.    Award Plaintiff damages in an amount to be determined at trial under Title IX;

2.    Award Plaintiff attorney's fees, costs, disbursements and expenses available under the law;

3.    Order Defendants to remove all notations of is disciplinary determination from Plaintiff's transcript and student record and to destroy all records relating thereto;

4.    Order Defendants to immediately terminate the suspension sanction and permit Plaintiff to return to RPI as a student in good standing, on track to graduate with his peers.

5.     Award such further and additional relief as the Court deems just and proper.

Dated: June, 18, 2019                    O'CONNELL AND ARONOWITZ

By: _____
_____
Scott W. Iseman, Esq.
Bar Roll #: 518859
Attorneys for Plaintiff
Office and P.O. Address
54 State Street
Albany NY  12207-2501
(518) 462-5601